## HILL *versus* NORRIS.

1. The drawer of a bill of exchange, is entitled to notice of non-payment, wherever it appears that he has any funds whatever in the hands of the acceptor.

2. So, if there be a running account between the drawer and drawee; and the former has a *bona fide* reason to believe that his draft will be honored, he has a right to notice.

In error from Bibb Circuit court.

Thomas P. Norris, assignee, brought an action of assumpsit against Alexander Hill, to recover the amount of a bill of exchange, drawn by the defendant on one Taylor of Mobile, and by the latter accepted. No evidence was produced to the jury, on the trial below, of an absolute notice of protest, or of a notice having been forwarded by mail, to the defendant.—The defendant's counsel moved the court to charge the jury, that if from the evidence, there was a running account subsisting between the drawer and acceptor of the bill, between the drawing, and its matu-

rity ; or, that if there were funds in the hands of the acceptor at its maturity, of an inconsiderable amount, then the drawer of the bill was entitled to notice. But the court charged, that although there might have been such running account, or such small balance ; yet if the latter were too inconsiderable to induce a reasonable expectation that the bill would be paid ; the drawer was not presumed to have been injured, and therefore not entitled to a notice of non-payment. The jury, under this charge, found for the plaintiff below ; and the same was here assigned for error.

*Ellis*, for plaintiff—*Gordon, contra.*

Lipscomb, J.—This cause comes before us, from the Circuit court of Bibb county, on a bill of exceptions to the charge given to the jury, on the trial, by the presiding judge. The action was brought by Norris, the endorsee of a bill of exchange; against Hill, the drawer. The bill was drawn on James Taylor, payable at the Bank of Mobile, twelve months after date. The bill was accepted by Taylor, but not paid ; and no notice was given to the drawer of non-payment, by the acceptor.

The defendant's counsel requested the judge to charge the jury, that "if they believed, from the evidence, that there was a running account between the drawer and the drawee, or acceptor of the bill of exchange, between the drawing of the bill and its maturity ; or, if there had been funds in the drawee's hands, belonging to the drawer, between the drawing and the maturity of the bill, or at its maturity, of an inconsiderable amount, and not sufficient

to pay the bill; the drawer was, nevertheless, entitled to notice before he could be chargeable on the bill;" but the court charged the jury, that although there might have been a running account at the maturity of the bill, or before it was matured, between the drawer and the drawee, and there might be a small balance due the drawer thereon, or any other inconsiderable fund, or debt, in the hands of, or due from, the drawee, yet, if the balance due on said account or fund, was not sufficiently large to raise a reasonable expectation, that the bill would be paid by the acceptor, when due, the drawer was not presumed to have been injured for want of notice, and, therefore, was not entitled to any, but liable in law, without notice of non-payment.

The charge of the court is now assigned for error.

The doctrine on the subject of notice to the drawer of a bill of exchange, grew out of the use, that they were peculiarly designed for: this was the safe transmission of funds from one place to another; as if A wished to employ his funds in Amsterdam, when they were in London, he would purchase a bill from B, whose funds were in Amsterdam, but who wished to use them in London; each of them would draw on his respective banker, and by this means avoid all risk. Bills were then drawn most usually on actual funds, consisting in gold and silver, in the hands of the person on whom the bill was drawn. If there was a refusal to pay, it was of the utmost consequence to the drawer, that he should have the earliest possible notice, to enable him to secure himself against an abuse of trust, that would be inferred in his banker, from such refusal to pay.

As commerce extended, bills were drawn on fac-

tors and agents, to whom goods had been consigned; and the same necessity existed for an earlier notice to the drawer, of the failure, by his agent, or factor, to pay. That, rendered it necessary in the first case. The security of the drawer, required that this notice should be given to him, for the purpose of withdrawing funds, or other assets, in the hands of the person on whom he had drawn. It was important, furthermore, that he should have this notice, to prevent his making other consignments, that might, and often would, be greatly jeopardized by being made to agents and factors in failing circumstances. The business between merchant and merchant, was then carried on upon solid capital, and the utmost extent of credit then known, was the faith reposed in the drawer of the bill, that it was drawn *bona fide* on a fund that he really had the control of. At a later period, and when commerce had become still more extended, not only in the means of carrying it on, but also in the theatre of its transactions, the credit system was introduced. Merchants obtained credit, based on their talents, and standing for integrity; the creditor relying principally on their future gains and profits, on merchandize, or articles of exchange. Bills were drawn, for the purpose ef creating funds, on persons who had no assets in their hands, of the drawer. These bills were called, in contradistinction to those drawn on funds, accommodation bills: they were accepted and put into market on the credit of the maker and acceptor. It is believed to have been on bills of this last description, that the doctrine of notice to the drawer, was first held to be not always necessary.

The case of *Bickerdike* vs. *Bellman*,[a] is the first adjudicated case, dispensing with the necessity of no-

[a] 1 Durn. & East. 40*8*.

tice. The reasoning of the court turns mainly on the ground, that the drawer knew, at the time of the drawing, that his bill would not be accepted, and that consequently, he could not be injured by a want of notice. It was said, too, that his drawing without funds was a fraud, and for that reason, he was not entitled to notice; the bill, in that case, was not accepted, and the court declared, that an acceptance would be *prima facie*, an admission of funds. The drawer, so far from having any funds in the hands of the drawee, was actually indebted to him in a large amount. I can not but believe, that although no stress was laid on this last fact by the court, that the drawer was largely indebted to the drawee, at the time he drew on him, that it was the strongest argument in favor of dispensing with the general rule, that notice ought to be given; because, that indebtedness would secure the drawer, if a remittance, or consignment, had been made by him, after the refusal to accept, and before notice of such refusal.

*a 3 Campb. 164.* In the case of *Thackray* vs. *Blacket*,[a] when the bills were drawn, the drawer had no effects in the hands of the drawee, but before they became due, the acceptors were indebted to him in an amount less than one of the bills, and became bankrupt: it was held he was nevertheless entitled to notice. Lord *Ellenbrough* remarks, " If there was an open account between the parties, and the acceptors were indebted in *any sum* to the drawer before the bills became due, I can not say that he must necessarily have been aware beforehand, that either of them would be dishonored.— Judges of great authority, have doubted the propriety of the rule laid down in *Bickerdike* vs. *Ballman*." And his Lordship expressed his determination not to

extend that rule.   No enquiry was made as to the
amount of assets, and the terms used, " if the accep-
tors were indebted in any sum;" seems to forbid the
enquiry, of the sufficiency of such indebtedness to
pay the bills; in fact, the case discloses that the in-
debtedness was not an amount equal to one of the
bills.

In the case of *French's ex'rs* vs. *The Bank of Co-* 4 Cranch 141
*lumbia,* the doctrine of the Supreme Court at Wash-
ington, is, that if the drawer at the time he draws,
has a right to expect his bill will be honored, he is
entitled to notice.   The action was founded on a
note given by W. M. Duncanson, payable to George
French, or order, and by him indorsed to the Bank.
The days of grace expired on the 12th December,
and demand of payment was made on the 15th, and
notice was not given to the endorser's executrix, un-
til January.   It was proven that no injury had been
suffered from a want of earlier notice.   The court
ruled, that the indorsor was entitled to strict notice.
And although it was admitted that in England a dis-
tinction had been made between drawers of a bill
and indorsers of a promissory note : and, that greater
strictness might be required in the latter case, than
the former; Chief Justice *Marshall* expressed the opi-
nion, that if the drawer has reason to believe his bill
will be honored, he is entitled to notice.

The doctrine of *Robinson* vs. *Ames,*[a] is, that if the
drawer had any funds in the hands of the drawee, he [a] 20 Johns.
is entitled, from that circumstance, to notice : and     149.
further, if he has no funds in the hands of the drawee,
but has reason, from other circumstances, to believe
that his bill will be honored, he is entitled to notice,
if it is dishonered.

[a]1 Stewart, 175.

The case of *Armstrong, McGee & Co.* vs. *Gay,*[a] contains nothing but the record of the case, as sent up from the court, and the judgment of affirmance in this court. It can not be considered as authority : it was affirmed on a divison; and the reasons of the judges in favor of their respective opinions, have not been filed, and consequently could not be reported. I never gave my assent to the affirmance of that judgment, and some of those who did, have since expressed their conviction that they were wrong. I then thought, and still think, that the judgment of the circuit court ought to have been reversed. We, then, have no adjudged case in this court, dispensing with notice, merely on the ground of a want of assets ; and the question is still open, as to what circumstances will excuse notice to the drawer, when his bill has been dishonored. The conclusion to be drawn from the principles of the authorities cited, seems to me to resolve itself into distinct propositions :

1st, That if the drawer has any funds in the hands of the drawee, he is entitled to notice.

2d. That without funds, if from other circumstances, he has reason to believe at the time he draws, that his bill will be honored, he is entitled to notice of its dishonor.

To the first proposition it is objected, that it is not sufficient that there should be funds, but that there must be a sufficient fund to pay the bill. I have not been able to find a single adjudged case where the amount of the funds in the hands of the drawee, has been made the criterion of determining on the draw-

[b]4 Barn. & Ald. 200.

er's right to notice. I can not consider the dictum of Lord Chief Justice *Abbot* in the case of *Smith* vs. *Thatcher,*[b] as ad-

verse authority. It is true, he does say that the acceptor is not entitled to notice, because there was not a sufficient fund to pay the bill, belonging to him, in the hands of Messrs. Coults & Co. where the bill was made payable, by the appointment of the acceptor. It does not appear that the acceptor, who was sued, had any funds in the hands of Messrs. Coults & Co. when the bill fell due ; nor was the amount of funds made a question. The insufficiency of the fund, does not appear in the case of *Thackray* vs. *Blacket*, to have supplied Lord *Ellenborough*, with a ground of dispensing with notice to the drawer. He ruled, that the notice was necessary to charge the drawer, although the funds in the hands of the drawee was not sufficient to pay one of the bills. If indeed the court were to assume the province, or should direct the jury to determine how far the assets in the hands of the drawee must be reduced before notice to the drawer could be dispensed with, it would be found exceedingly difficult, and perhaps I might with truth say, that it would be impracticable, to fix on any standard of depreciation. The instructions of the court below, were to the effect, that if there was a very small amount of funds in the hands of the drawee, that it did not entitle the drawer to notice : and the court seems to have drawn the conclusion, that if the amount of funds so in the hands of the drawee, was small, that the drawer could not be injured from a want of notice. It seems, however, to us, that the reason of the rule would apply, and that, although there might be but a small amount of assets, the drawer ought to have notice, to enable him to take steps to secure that amount, whatever it might be.

I admit, that if there were circumstances to satisfy the jury that the drawer committed a fraud in drawing on the drawee, and that he knew that his bill would be dishonored, that there would be much force in the argument that he ought not to be permitted to take shelter from the consequences of his fraud by intrenching, behind a very small amount of assets that might be in the hands of the drawee. But I must again repeat, that I have not known a case, where there was any amount of funds in the hands of the drawee, that it has been ruled, that the drawer was not entitled to notice. In this case the acceptance of the bill would have a tendency to rebut the presumption of fraud, if any could be drawn from the smallness of the amount of the funds.

Under the second proposition, that if the drawer believed his bill would be accepted, that he is entitled to notice of its dishonor, there is a great variety of circumstances that would seem to justify, on the part of a drawer without funds, on mere accommodation paper, a belief, honestly, that his bill would be duly honored.

In the case of *Robinson* vs. *Ames*, the circumstance of an agreement to accept, and an account between the parties were held to be sufficient to authorise the drawer to believe his bill would be honored.

The fact of their being an open account, and a small balance, seems, in the opinion of Lord *Ellenborough*, in the case above cited, to be sufficient to authrise the belief that the bill would be honored ; or at any rate to rebut the conclusion, that the drawer knew that his bill would be dishonored. We believe, that if there was a running account between the drawer, Hill, in this case, and Taylor the drawee,

that it was such a circumstance as would forbid us to say that he knew his bill would not be honored at the time he drew it. If there is an account current, between merchant and merchant, and a bill drawn in the course of business, although without funds, the inference would be a strained one indeed, that the drawer knew that his bill would be dishonored, But nothing is of more common occurrence, than for our planters to draw on their factor on sufficient time to enable them to deliver their crops by the maturity of the bill, where they have no funds in the hands of their factor. Now, if their bill should be dishonored when presented for acceptance, a notice of such dishonor, will prevent their placing their cotton at the factor's disposal. But if we say that this notice may be withheld from them, we open a door for the greatest fraud to be practiced. The planter honestly intending to provide a fund to meet the maturity of his bill, and supposing it to have been accepted by his factor, ships his cotton to him, enabling him to dispose of it, and perhaps he will never be able to realise the proceeds of the sale; when, if he had been notified that his bill had not been accepted, he could have guarded against such fraud. In the more recent cases in England, the judges have uniformly regretted the rule established in *Bickerdike* vs. *Bullman*; and we have no less cause to deplore its recognition on this side the Atlantic.

In this country, bills of exchange are not confined to commercial transactions, between merchant and merchant, but as we have before observed, the planter is in the practice of drawing on his factor for the amount of the sales of cotton, or in the anticipation of a shipment to be made. These men are not as fa-

miliar, with such transactions as their factors; nor are they generally as astute in providing against insolvencies; and it as important that they should have timely notice of the dishonor of their bills, drawn in anticipation of the shipment of their cotton crops, as if the sales had already been made, and the proceeds in the factor's hands. The fact of the existence of a running account, between two men engaged in business,, and the acceptance of a bill by one of them, for the other, affords a two-fold ground of presuming the drawer believed the bill would be honored: the fact of their accounts being unclosed, is one, and the acceptance is the other. Indeed, it is difficult to arrive at the conclusion, that the drawer did not feel himself authorised to draw, if the bill has been accepted. If notice had in no case been dispensed with, no injury could have resulted from requiring it to be given: because, it would be so easy to conform to the rule. The first departure from it has introduced much litigation, and often a tedious and complicated inquiry, into the state of funds and the circumstances under which the bill was drawn. We are, therefore, of the opinion, that the judgment of the court below must be reversed, and the cause remanded.